## Case No. 2,913.

### The CLYTIE.

[10 Ben. 588; 25 Int. Rev. Rec. 335; 14 Am. Law Rev. 85.][1]

District Court, E. D. New York.   Oct., 1879.

COLLISION IN NARROW CHANNEL — OVERTAKING VESSEL — RULES OF NAVIGATION — CHOICE BETWEEN DOUBTFUL MEASURES — TESTIMONY OF EXPERTS.

1. Where the C. and the V., two yachts of a squadron, beating out of New Bedford harbor, wind S. S. E., weather clear and all vessels in plain sight, being at one time on parallel courses about a hundred and forty feet apart and approaching a long tow crossing their then courses, went about so near together that the jib-boom of the one astern as she forged ahead caught the outer leach of the main-sail of the other then crossing her bows and just filling away on the other tack, and some slight damage was done, for which suit is brought: *Held*, that the C. was the overtaking vessel under rule 22 (Rev. St. art. 17, § 4233), but nevertheless it was the duty of the V., under the circumstances, to terminate her port tack in time to enable the C. to tack between the tow and herself, whether or not she was hailed so to do.

2. That the C. was justified in holding her reach, relying upon the V.'s shortening her tack if necessary, provided that she herself went as near the tow before tacking as was prudent for her to go.

3. That upon the evidence the C. might have gone much nearer the tow in safety, and as only six feet nearer was required to have enabled the yachts to pass each other clear. she must be held responsible for the collision and damage, and the V., having left her room enough, must be held not in fault.

4. That when of two doubtful measures to be decided on to avoid a collision, the one taken carries the vessel so nearly clear as six feet, it cannot be imputed to her as a fault that she did not take the other course.   What a yacht is willing to do for the sake of winning a wager, she is, in a case of necessity, bound to do to avoid a collision.

5. Semble, that even where a case is governed by statutory sailing rules, the question being whether the circumstances are special and render a departure from the rule necessary. the testimony of practical seamen as experts may be taken.

Nath. Niles, for libelant.
H. S. Ledyard, for claimant.

BENEDICT, District Judge.   This is an action involving an insignificant sum of money, which has been brought, as I must suppose, for the purpose of obtaining a judicial determination of certain nautical questions, both of law and of fact, that have come to be matters of dispute between the parties thereto.   The earnestness displayed by the respective advocates, and the amount of time they have felt justified in consuming in the presentation of the case, indicate that, by the parties at least, these questions are deemed of importance.

The incident that gave rise to the controversy was the tearing of the mainsal of the yacht Volante by the yacht Clytie, while the two, together with the rest of the New York yacht squadron, consisting of some twenty vessels. were beating out of the harbor of New Bedford, on the 15th day of August, 1877.   The parties to the controversy are, on the one side, Francis B. Hitchcock and Thomas Hitchcock, who, as owners of the yacht Volante, have filed their libel against the yacht Clytie, to recover the damages by them sustained by reason of the tearing of their sail; on the other side, William L. Brooks, who, as claimant of the yacht Clytie, appears in her defence.   The facts attending the collision have been narrated to the court by some thirteen witnesses who saw the occurrence, and in addition expert testimony from several witnesses has been presented.

The vessels involved are described as follows:   The Volante is a sloop, English cutter rigged, forty-five feet long with twenty feet of bowsprit out-board, making sixty-five feet in all.   The Clytie is a schooner, eighty-five feet long, one hundred and thirty-five feet from the end of the main-boom to the end of the flying jib.

The account of the accident given by the parties in their pleadings, first deserves attention.   According to the statement in the libel, the Volante was standing out of New Bedford harbor, close hauled upon the starboard tack, and near the middle of the channel, standing to the eastward at the speed of about three knots an hour, the wind being from the southward and eastward.   While the Volante was in the situation aforesaid, the Clytie, on her way out of said harbor, was standing to the southward or southward and westward, and had been, for not less than half an hour, visible from the Volante's deck.   The Clytie was to leeward of the Volante and bearing to the northward and westward, and was close hauled on the port tack, sailing as fast or faster than the Volante, and was heading so that she would strike the Volante on the Volante's quarter, or else would pass astern of the Volante.   Thereupon, when so to leeward of the Volante and close aboard, the Clytie went in stays, and while in stays ran into the Volante on her port side near the quarter, while the Volante was in the position above described; and the libel charges that the Clytie should either have kept off so that she would go well astern of the Volante, or else have gone in stays sooner so as to allow for headreaching while in stays.

It will be observed that the case stated in the libel is that of two vessels under sail, close hauled, having the wind on different sides, and crossing so as to involve risk of collision.   That is to say, the libel states a case where it was the duty of the Clytie, having the wind on her port side, to keep out of the way of the Volante.   A violation of sailing rule 17 (article 12). is therefore the fault charged upon the Clytie in the libel.

---

[1] [Reported by Robert D. Benedict. Esq.. and Benj. Lincoln Benedict. Esq.. and here reprinted by permission. 14 Am. Law Rev. 85, contains only a partial report.]

The Clytie in her answer denies the correctness of the account given in the libel, and gives an account of the accident in substance as follows: The Volante and Clytie were beating out of the harbor of New Bedford, the wind being about southeast and a fair working breeze. The channel at the place of collision was only about an eighth of a mile wide, and this distance, so far as the working room of the two yachts was concerned, was diminished by half, owing to a tug which was standing out of the harbor in the middle of said channel having two large yachts in tow, one astern of the other with a long hawser between them, and heading about south. The Volante was on the port tack, close hauled, and heading so that she would strike the tow unless her course was changed. The Clytie was on the same tack, close hauled, and a little to leeward and astern of the Volante, and heading so that she also would have to change her course before reaching the middle of the channel in order to avoid striking the said tow. Several other yachts were to leeward of the Clytie on the same tack, one of them being so close under her lee that the Clytie could not keep off without coming in contact with her. The Clytie was going faster than the Volante and was so close aboard of her that she could not luff up or go about without running into the Volante. The Volante kept her course unchanged until very near to the said tow, when she went about and filled away on the starboard tack. At the moment the Volante so went about the Clytie was still to leeward of her and had nearly caught up with her, and it was absolutely necessary for the Clytie then to go about to avoid running into the tow which was close aboard of her, and accordingly she went in stays; but being a much larger vessel than the Volante, it took her much longer to get around, so that while she was still in stays the Volante had got around on the starboard tack and was heading directly across her bow. Those on board the Clytie, seeing that there was no room for her to get around on the starboard tack without certainly running into the Volante, kept her in stays, so that the Volante, by luffing up a little, might allow the Clytie to pass astern of her; but the Volante, instead of luffing up, kept her course with sails full, and came straight across Clytie's bow, so close that just as she was going past, the head boom of the Clytie caught in the Volante's mainsail, forward of the leach rope, and brought her up all standing. The answer expressly admits that at the time of the collision the Clytie was going fast enough to steer well and charges the accident to have been caused by the fault of the Volante in not going about on the starboard tack sooner than she did, and in not luffing up after she had got about on the starboard tack, so as to allow the Clytie to pass astern of her.

The case stated in the answer is obviously one to which sailing rule 17 (article 12) has no application, but is that of one vessel, close hauled, overtaking another vessel close hauled upon the same tack and to windward, under circumstances rendering it impossible for the overtaking vessel to avoid colliding with the leading vessel while tacking, because of a failure on the part of the leading vessel to give the following vessel room to make her tack. According to the answer, therefore, the case is one to which sailing rule 24 (article 13) applies, where, by reason of special circumstances, the general rule applicable to overtaking vessels is not to be applied, and the leading vessel is to be charged with fault for failing to make proper effort to prevent a collision otherwise unavoidable. The special circumstances are the narrow distance in which the yachts were compelled to work; the presence of the tow directly in the course of both yachts; the relative speed of the yachts and their position with reference to each other. It is thus seen that the pleadings of the respective parties state cases wholly dissimilar.

If this case were one in which to enforce the rule of the admiralty whereby the decree is required to be according to the averment in the pleadings as well as according to the proofs, and the enquiry was therefore limited to whether the collision occurred as stated in the libel, a short disposition could be made of it; for, although Mr. Hitchcock's statement upon the stand, in harmony with his account in the libel, is that the Clytie was upon the port tack at the time of the collision, the evidence of the other persons present does not permit it to be contended that the Clytie was upon the port tack at any time after the Volante had gathered way upon the starboard tack. But I have not been asked to dismiss this libel upon a question of pleading, and as the answer sets forth an affirmative case, in regard to which evidence has been given and argument made on both sides, I can properly consider the points thus submitted for decision. The Clement [Case No. 2,879]. It will aid to an understanding of these points to state here such facts as I find to be either admitted or proved beyond dispute. The collision occurred in broad daylight. The wind at the time was blowing a fresh breeze from the south-southeast. The weather was clear and the vessels were in plain sight of each other for a considerable period before they came in collision. As stated in the libel, the collision occurred near the middle of the channel, which was at that place obstructed by the tow described in the answer, then passing to the southward, somewhat to westward of the middle of the channel, and, so far as these two yachts were concerned, having the effect to narrow the channel by nearly one-half. The tide was flood. The Volante and the Clytie got under weigh with the rest of the squadron at the signal given. Their first tack was to the eastern shore, heading about

for red buoy No. 16, on the eastern side of the channel, opposite Palmer's island. On this tack the Volante came abeam of the Clytie while the latter was getting away from her anchorage, and was to the windward as the yachts approached buoy 16. The Clytie was the larger and faster vessel of the two, and as they neared the buoy, hailed the Volante to go about. The hail was heard on board the Volante but disregarded, and the Clytie, to avoid the Volante, passed inshore of the buoy. While there coming about she caught her centre-board on the reef, stopped short for a moment and fell off some four points.

Before coming to her course by the wind on the port tack, she passed some distance to the eastward from the buoy. When she did come by the wind the Volante was to windward of her and ahead, the courses of the vessels upon the port tack being about parallel and some one hundred and forty feet apart, as stated by Mr. Brooks. The tow was in front of both yachts upon that tack, and it was apparent to both that a tack must be made by both vessels to eastward of the tow. As they drew near the tow the Volante first put her helm down and tacked quickly without losing her headway in any substantial degree. The helm of the Clytie was put hard down immediately after the Volante was seen to be tacking. As the Clytie came head to wind she forged ahead, and while head to wind, and as the answer expressly admits—therein contradicting the evidence of her sailing master—while "going fast enough to steer well," her jib boom caught in the outer leach of the mainsail of the Volante, then crossing her bows upon the starboard tack with sails all full. Had the Clytie been six feet further to the westward there would have been no collision. Twenty-five feet was a safe distance from the tow for the Clytie to be when head to wind. How far from the tow the Clytie was, in fact, when she came head to wind is a question over which the contest has been severe. The distance astern of the Volante at which the Clytie was when she came by the wind upon the port tack, is equally a matter in dispute.

Upon these indisputable facts it has been contended in behalf of the Clytie that inasmuch as the Volante started from her anchorage further up in the harbor and astern of the Clytie, the Volante was the overtaking vessel at the time of the collision and charged with the duty of avoiding the Clytie. But I cannot agree to this view. On the contrary, I am of the opinion that from the time when the Clytie was stopped near buoy 16, at which time the Volante was standing over to westward towards the tow, on her port tack, the Clytie was the overtaking vessel.

I next notice the contention of the Volante that the Clytie is responsible, because, being the overtaking vessel, she came in collision with the Volante in violation of sailing rule 22 (article 17), which provides that "every vessel overtaking any other vessel, shall keep out of the way of the last mentioned vessel." The responsibility of the Clytie does not necessarily follow from the mere fact that she was overtaking the Volante on the port tack. For sailing rule 22 (article 17), like all the other statutory sailing rules, is subject to sailing rule 24 (article 19), which provides that "in construing and obeying these rules due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger." Accordingly it is contended on the part of the Clytie that in this instance the relative speed of the two yachts and their position with reference to each other and to the tow ahead, were circumstances that required the Volante to shorten her course upon the port tack sufficiently to enable the Clytie, on reaching the tow, to come to the wind between the Volante and the tow, and so pass to windward; and it is claimed in behalf of the Clytie that the sole cause of the collision was the fault of the Volante in continuing her port tack so near to the tow as to render it impossible for the Clytie to avoid collision at the tow.

Upon the evidence there is no room to doubt that, however the fact may have been at the time when the Clytie came on the wind on the port tack, there was a time after both vessels were on the wind when the Clytie had gained upon the Volante to such a degree that it was impossible for her either to luff clear of the Volante or to go upon the starboard tack under the Volante's stern, or to clear the tow by bearing away, or to slacken her speed, or to anchor; and that after that point had been reached by the Clytie it was still possible for the Volante, by shortening her port tack, to enable the Clytie to tack at the tow without hitting either the tow or the Volante, and so avoid collision. From that time forward the right of the Volante to keep her course without reference to the Clytie was at an end, and it became her duty to terminate her port tack in time to enable the Clytie to come to the wind in safety between the tow and the Volante. This obligation rests upon principle, for under the circumstances stated, if the Volante should fail to shorten her tack, it would not be possible for the Clytie to avoid striking the Volante except by running into the tow, while it would be entirely possible for the Volante to shorten her tack without any substantial loss of distance or increase of risk, and thereby to prevent a collision. The decisions are uniform that no vessel can properly insist upon adhering to a right given by any sailing rule when a collision will be caused by such adherence. This understanding of the duty of the Volante under the circumstances stated, derives support from the evidence given by experts as to the practice of seamen under similar circumstances. It has been said here that expert

testimony is incompetent in a case governed by statutory sailing rules. But where the question is whether the circumstances are special, and render a departure from the general rule necessary to avoid immediate danger, it appears to me to be both reasonable and proper to consider the effect given to similar circumstances by practical seamen in actual navigation. It is the testimony of all the experts that under circumstances similar to those stated it is the practice among seamen for the windward vessel to shorten her tack with reference to the necessities of the vessel to leeward; but some intelligent seamen, differing from others equally intelligent, say that in practice, the windward vessel never goes about for the vessel astern, unless she is hailed to go about by that vessel. Manifestly, on this occasion, it was not supposed by those on board the Volante that a hail from the Clytie was necessary to render it obligatory on them to shorten their tack, for Mr. Center, a yachtsman of large experience, who was on board the Volante and part of the time at her helm, and who is called as a witness by the libellants, and who says that he heard no hail from the Clytie (as say all the others on board), when particularly interrogated in regard to the Volante's movements, gives the following testimony: "Q. What was your object in going about as you did? A. To give the other boat plenty of time; I saw the Clytie coming behind us, and in order to give him time. Q. You thought you had to do that? A. Always have to do it."

But whether a hail from the Clytie was or was not necessary in order to cast upon the Volante the duty to shorten her tack, is a question of no importance in this instance, because there is convincing evidence that the Volante while on the port tack was loudly hailed and beckoned to go about. It is true that no one of those on board the Volante who have been called as witnesses, heard the hail or saw the signal from the Clytie, but this negative evidence is by no means sufficient to overthrow the positive and particular testimony of the seaman on the Clytie who gave the hail and made the signal, the sailing master who ordered the hail to be given, and the witnesses on the Clytie who heard the order obeyed. The evidence for the Volante, in regard to not hearing the hail, can do no more than convict those on board of a want of proper attention. The Clytie was known to be coming behind them to leeward and on the same tack, that she was the faster vessel and that both were approaching an obstacle that would compel both to tack. If it be the practice under similar circumstances for the leeward vessel to hail, there was every reason for those on board the Volante to anticipate a hail from the Clytie which would require the Volante to go about, and it was the duty of those on board the Volante to be watching for the signal. Had they been watchful, there is no room upon the evidence to doubt that they would have heard the hail that was given or seen the signal that was made. The legal obligation of the Volante to shorten her tack is therefore the same as it would have been had she heard the hail.

The next question is, did the Volante so tack as to permit the Clytie to come to the wind between the tow and the Volante without hitting either? That it was the duty of the Clytie under the circumstances to hold on to her port tack as long as was possible without running into the tow is conceded by her; failure on her part to perform this duty must render her liable. On the other hand, if there was no such failure on the part of the Clytie, the fact that the vessels collided in the manner they did, convicts the Volante of a failure sufficiently to shorten her tack, and casts upon her alone the responsibility for the accident. It is thus seen that the vital question of the case is one of fact—a question of distance—namely, the distance from the tow at which the Clytie was when she came head to wind.

Before passing to the consideration of the question of this distance I turn back to notice the point made in behalf of the Volante, that whatever failure of duty there may have been on the part of the Volante after the Clytie had approached so near as to render it impossible for her to luff clear of the Volante's stern, the Clytie was guilty of fault for not either tacking under the Volante's stern as soon as she had come by the wind, at which time, as it is contended, it was possible for her so to do, or for not slacking her speed or casting anchor at that time, and so to avoid being afterwards placed in a position where she would be forced to run into the Volante or the tow unless the Volante afforded a way of escape by shortening her tack.

Here, too, the parties differ upon a question of fact. On the part of the claimant it is insisted that there was no time after the Clytie came to the wind when she was not too near the Volante to permit of her passing under the Volante's stern. But the weight of the evidence upon this question appears to be in favor of the Volante. Indeed, if at the time the Clytie did tack, she caught the Volante's mainsail with her jib-boom, she being then head to the wind and the Volante having then tacked and filled away to the eastward, it seems certain that if at an earlier period, when she was not so close to the Volante, and when the Volante was still moving to westward on the port tack, the Clytie had tacked, she would have cleared the Volante entirely. Such being the fact, if the Clytie had been a steamboat, able to stop at pleasure, or if the vessels had been in the open sea, it would be difficult to say that the Clytie was not in fault for not taking steps to avoid getting into a position of danger under the lee of the vessel ahead. But,

considering that the Clytie did not get upon the wind until some distance over from buoy No. 16, and in view of the importance of keeping herself in full control when the working room was so narrow and so many other vessels were approaching from behind—the vessels then being opposite Palmer's island, and, according to Mr. Center, having only from four hundred to five hundred feet of working room—I am inclined to believe that the Clytie was justified in holding her reach, relying upon the Volante's shortening her tack when she approached the tow, in case the Clytie should then have approached so near as to render action on the part of the Volante necessary to avoid collision.

In reaching this conclusion, based as it is upon the peculiar situation of these vessels, I do not, as I conceive, trench upon the established rule applicable to the overtaking vessel under ordinary circumstances, nor do I go contrary to any adjudged case that I have been able to discover after careful search in the reports, not omitting the cases of The Nellie D. [Case No. 10,097]; The Charlotte Raab [Id. 2,622]; Whitteredge v. Dill, 23 How. [64 U. S.] 453; The Priscilla, 1 Asp. 469.

Manifestly the Clytie could not have borne away as soon as she had come by the wind without danger of becoming involved with some of the nineteen yachts that were beating out behind her, and surely she was not bound to heave to or anchor in mid-channel under such circumstances. That those on board the Volante did not at the time expect the Clytie under the circumstances to abandon her tack, but anticipated that she would hold on and rely upon having room left her by the Volante in which to come to the wind upon reaching the tow, is, moreover, quite evident.

I am thus again brought to the vital question of the case, namely, as to the distance at which the Clytie was from the tow at the time when she was in stays head to wind. The evidence bearing upon this question consists of estimates of the distance given by witnesses upon the stand, some of whom were on board the Volante, some on the Clytie, some on the tow, and some on other yachts in the squadron. Besides these estimates there are various facts proved in regard to position, bearing, speed and movements of the respective yachts which serve to show this distance. The testimony of Mr. Center goes to show that the Clytie came head to wind when over two hundred feet distant from the tow. Dayton, who was on board the yacht Rambler, in the tow, puts the Clytie one hundred and forty feet from the tow when head to wind. Thomas, who was also on the Rambler, makes the distance sixty feet. Mr. Brooks, the claimant, gives the distance at twenty-five or thirty feet. Belmont, the sailing-master of the Clytie, says twenty-five feet. Lyons and Adams,

who were on board the Clytie, say forty feet, and Jones says thirty feet. In this variety of estimates it is forcibly argued in behalf of the Clytie that the judgment of the competent men who were on board the Clytie and charged with the duty of determining when it was necessary to come into the wind, is more reliable than estimates made after this lapse of time, and affords a sure foundation for the judgment of the court. But while the presumption certainly is in favor of the correctness of the judgment formed on board the Clytie in regard to the time when it was necessary to put their helm down, there are in the case facts proved by these same persons which show the judgment thus formed to have been erroneous, and that the Clytie did not stand as near to the tow as she could have done with safety. It has already been stated that the Clytie could go within twenty-five feet of the tow without danger. This fact is not open to be disputed by the claimant, for the sailing-master of the Clytie fixes that as the distance at which she was in fact, and Mr. Brooks himself believed that she would come head to wind within twenty-five or thirty feet of the tow. It is also in proof that the Volante put her helm down before the Clytie did, and tacked very quickly without losing her headway. The Clytie took some time—fifty seconds, according to the best estimate Mr. Brooks can give—to come head to wind, and then she forereached a considerable distance on a line parallel with the tow. While the Clytie was thus moving parallel with the tow, Mr. Brooks says he noticed the Volante to be on a course across the line of the Clytie's direction, about fifty feet away from the Clytie and coming with a heavy full, giving her a speed of three knots or more. This position of the Volante, after she had tacked, on the starboard bow of the Clytie, shows clearly that the Clytie came head to wind much more than twenty-five feet from the tow. Again, several of the claimant's witnesses show that the Volante made her tack and gathered headway between the tow and the line of the Clytie's direction as she was head to wind, and the Volante was sixty-five feet long including boom. Mr. Brooks also says, "If the Volante had kept on a little further and then gone about she would have been safe." The distance between the Clytie when head to wind and the tow was therefore more than sufficient for a vessel sixty-five feet long to tack and gather headway. This shows the distance to have been greater than is estimated by the claimant's witnesses.

Again, the sailing master of the Clytie says that the Volante should have luffed when she bore four points on the Clytie's starboard bow; at another place that she could have luffed when she was two or three points on the Clytie's starboard bow; and at another place, that the Volante ought to have luffed when she had gone about two lengths

on her starboard tack. This testimony, by the claimant's sailing master, shows the distance in question to have been greater than the claimant supposes. So also Mr. Brooks says, that if the Volante, when she was two or three points on the Clytie's starboard bow, had luffed, there would have been no collision. If there was room for the Volante, being between the Clytie and the tow, and about fifty feet ahead, to bear two or three points on the Clytie's starboard bow and there luff, clearly the distance between the Clytie and the tow was more than one hundred feet.

In addition to these facts, proved by the claimant's own witnesses, there is the fact stated by the mate of the Active, a yacht to the leeward of the Clytie, that his yacht on her port tack passed the Clytie's stern when the Clytie was head to the wind, and went several lengths further to westward, and then tacked in the wake or rather to eastward of the wake of the last boat of the tow. It is true that this same witness says that the Clytie went close to the tow and near as he would dare to go, but his opinion is overthrown by his act, for he went with his own boat at the least one hundred and fifty feet nearer the line of the tow than the Clytie did. The Clytie having the ability, as she herself shows, to come to wind within twenty-five feet of the tow, and the position requiring that she should be only some six feet nearer the tow than she was, to enable her to clear the Volante, the facts above mentioned plainly show that the Clytie had room to tack at the tow without coming in contact with either the Volante or the tow. This conclusion is decisive of the controversy, for it follows that the Volante having by accident or design—and it matters not which—left room for the Clytie to come to the wind without hitting either the Volante or the tow, was guilty of no fault, and that the fault which caused the collision was the failure of the Clytie to go as near to the tow as she could with safety.

Another fault has been strongly urged against the Clytie, namely, that after she had come head to wind and when she saw the Volante gathering way across her bows and likely to be caught in passing, she did not swing to westward the six feet that was needed to avoid collision.

The Clytie's sailing master upon this point testifies that when his vessel was within a point of head to wind he steadied his helm and kept it steady a few seconds, and when he was head to wind he ported his helm a little. There may be room for the surmise that putting the helm hard-a-port at that time would have caused a failure to tack; but no witness, as I recollect, has testified that such a result would have been likely to follow such a movement of the helm. The only excuse for not putting the helm hard-a-port instead of porting it a little, given by the sailing master, is that the vessel's headway was then slow and the helm had no effect. But this excuse cannot be received in the face of the specific statement in the answer that at the time of the collision the vessel was going fast enough to steer well. It should also be noticed in this connection, as bearing upon this and other questions of the case, that these two vessels were yachts, subject of course to the sailing rules applicable to all sailing vessels, and to no other, but possessing ability to move rapidly and manoeuvre quickly, supposed to be fully equipped, and in the charge of skilful men. A prompt employment of their full capacity to avoid collisions may be justly required of such vessels in all cases of danger. What a yacht is willing to do for the purpose of winning a wager, she is in a case of necessity bound to do for the purpose of avoiding collision. While, therefore, it may be said to be requiring much of the Clytie to say that she could have avoided the collision by putting her helm hard-a-port after she had come head to wind, in view of the evidence and the answer, it is not easy to absolve her from fault in this respect.

There remains to consider the point made in behalf of the Clytie, that the Volante was in fault for not luffing up into the wind as soon as she filled on the starboard tack, and thus avoiding the Clytie, then coming head to wind. It is possible that the Volante, being a very quick vessel, could have done this. Such is the opinion of those on the Clytie. But whether the danger of collision then imminent would be lessened by luffing or keeping full on the part of the Volante was a close question. The decision made carried her within six feet of clear, and no one can say with certainty that by luffing she would have done better. It cannot, I think, be imputed to the Volante as a fault, that of two doubtful measures she adopted one that so nearly carried her clear.

I have now examined all the questions in this case as to which my opinion has been asked. The result of that examination is the conclusion that the collision mentioned in the libel was caused solely by the fault of the Clytie, and that the libellants are entitled to recover herein the damages sustained by reason thereof. There must therefore be a decree in favor of the libellants, with an order of reference to ascertain the amount.